## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

TERRANCE WAYNE BUESCHER,

        Defendant.

No. CR23-4014-LTS

**ORDER REVERSING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION REGARDING MOTION TO SUPPRESS**

## I.  INTRODUCTION

This case is before me on a Report and Recommendation (R&R) (Doc. 43) in which Chief United States Magistrate Judge Kelly K.E. Mahoney recommends that I deny defendant Terrance Buescher's motion (Doc. 31) to suppress.  Buescher filed timely objections (Doc. 46) and the Government replied (Doc. 49).

## II.  BACKGROUND

### A.  *Procedural History*

On February 16, 2023, the Grand Jury returned an indictment (Doc. 3) charging Buescher with conspiracy to distribute methamphetamine, possession with intent to distribute methamphetamine and possession of a firearm in furtherance of a drug trafficking crime.  Buescher filed his motion (Doc. 31) to suppress on April 12, 2023, and the Government filed its resistance (Doc. 36) on April 28, 2023.  Judge Mahoney held a suppression hearing on May 15, 2023.[1]  Doc. 40.  The Government presented testimony from Rock Valley Police Officer Jordan Kerr and Drug Enforcement

---

[1] The hearing transcript is available at Doc. 44.

Administration Task Force Officer Ben Gill. *Id.* Judge Mahoney also admitted defense exhibits A through E and Government exhibits 1 and 2 into evidence. *Id.* Judge Mahoney filed the R&R on June 29, 2023.

**B.    Relevant Facts**

Buescher seeks to suppress evidence resulting from a January 23, 2023, traffic stop.[2] On that day, Rock Valley Police Officer Derek Dreise stopped Buescher (whom he knew from previous traffic stops) while Buescher was driving a 2004 Ford Explorer with dark window tint. During the stop, Dreise confirmed the window tint exceeded the legal limit. Buescher told Dreise he was coming from Sioux Falls, South Dakota, but Dreise had information suggesting Buescher had been at a casino in Larchwood, Iowa. Dreise also noted signs Buescher was impaired, including "body tremors, eyelid tremors, involuntary muscle movements, bruxism, thick and rapid speech pattern, tooth decay, and short and rapid breath pattern." Doc. 43 at 2 (citing Ex. A at 1). Dreise asked Buescher to accompany him to the patrol vehicle, and Buescher complied. Dreise reported that "[Buescher] exhibited lackadaisical mannerisms when he stepped out of his vehicle by shrugging his shoulders although he walked rapidly and in a rigid walking style." Doc. 43 at 2 (citing Ex. A. at 1).

While the two spoke in the patrol vehicle, Dreise requested assistance from Officer Kerr and his police canine, K-9 Gus. Dreise issued Buescher a citation for failing to provide proof of insurance and a warning for the window tint. Dreise also told Buescher he believed Buescher was impaired and Buescher agreed to participate in a field-sobriety test. While Dreise conducted these tests, Kerr and K-9 Gus arrived. Judge Mahoney described the subsequent sniff of the vehicle as follows:

> Officer Kerr led K-9 Gus around Buescher's vehicle three times (he
> testified he normally does two or three passes when conducting a drug

---

[2] The facts are taken from Judge Mahoney's R&R. Doc. 43.

sniff). Officer Kerr and K-9 Gus followed their standard pattern by starting at the front passenger headlight and moving counter-clockwise around the vehicle. Kerr walked backward ahead of K-9 Gus, who was on a four-foot leash. Officer Kerr testified that on the first pass, K-9 Gus showed some interest at the driver's door (by smelling longer at that location) but did not provide a positive indication. Officer Kerr testified that he believed K-9 Gus was distracted by Officer Dreise, who helps with training K-9 Gus and also pets him when they are both at the police department. Officer Kerr testified he had to refocus K-9 Gus back to the drug sniff (saying "leave Derek alone" and "wrapping" or turning K-9 Gus around). This can be seen and heard on the videos. According to Officer Kerr, K-9 Gus did not alert or show interest in the Explorer on the second pass. On the third pass, K-9 Gus put his nose in the open driver's window and tried to jump inside twice. Officer Kerr testified this was an alert by K-9 Gus that he had found the odor of narcotics. Officer Kerr prompted K-9 Gus to "find drugs" and Gus gave a positive indication by sitting down and staring. Officer Kerr testified that during each pass of the Explorer, he pointed with his hand to various areas on the Explorer to direct K-9 Gus where to go, and that he never intended to put his hand inside the open driver's window.

Doc. 43 at 3.

During the search, the officers recovered a 9mm Smith & Wesson handgun, ammunition, a digital scale, drug paraphernalia, a cell phone, pills and three baggies of a substance that field tested positive for methamphetamine. Dreise arrested Buescher for possession of methamphetamine and transported him to the police department to investigate whether Buescher was driving while intoxicated. At the station, Buescher declined a Drug Influence Evaluation but provided a urine sample. The sample tested presumptively positive for methamphetamine and amphetamines. Officers then booked Buescher into the Sioux County, Iowa, jail on state charges.[3]

---

[3] Judge Mahoney noted that Buescher later made incriminating statements in a post-*Miranda* interview with Gill. However, Buescher has not suggested he seeks to suppress any statements made to Gill. Doc. 46 at 8 ("Because law enforcement seized the physical evidence at issue as a direct consequence of their illegal trespassory search, it should be suppressed.").

3

### III.    STANDARD OF REVIEW

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

4

## *IV.    DISCUSSION*

Buescher objects to the following conclusions by Judge Mahoney: (1) K-9 Gus did not trespass into Buescher's vehicle, and therefore, the police did not conduct a warrantless search of the vehicle, and (2) Kerr acted reasonably while conducting the drug sniff with K-9 Gus.  I will address these issues in turn.[4]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  The parties do not dispute that a drug dog may sniff the exterior of a vehicle without implicating the Fourth Amendment.  *Illinois v. Caballes*, 543 U.S. 405 (2005).  However, they dispute whether Kerr and K-9 Gus conducted a warrantless, unreasonable search when each of them broke the plane of the open driver's side window during the sniff.

[5]

_____

[4] Buescher objected to other factual findings by Judge Mahoney.  I will address those findings as I address her ultimate legal conclusions.

[5] All images of K-9 Gus conducting the search are screenshots of Exhibit C from the suppression hearing.



Their arguments focus on three cases: *United States v. Lyons*, 486 F.3d 367 (8th Cir. 2007); *United States v. Jones*, 565 U.S. 400 (2012); and *Florida v. Jardines*, 569 U.S. 1 (2013). In *Lyons*, a canine stuck his head through an open passenger-side window and then sat down beside that door, indicating he "had found the strongest source of the odor of narcotics." *Lyons*, 486 F.3d at 370. The Eighth Circuit noted that the officer had not created the opportunity to breach the interior of the vehicle because the defendant had left the window down when he exited the vehicle. *Id.* at 373. The canine's handler had not directed the dog to break the plane, and "[a]bsent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment." *Id.* The court also found that the dog would have indicated on the vehicle even if he had not put his head through the open window, and therefore, "[g]iven the certainty that the course of action the police were pursuing at the time of the [dog sniff] would have led to discovery of the same evidence forthwith by unquestionably legal means, there is no reason to penalize the police for this accident by excluding evidence." *Lyons*, 486 F.3d at 373-74 (internal quotation marks omitted).

6

In *Jones*, decided five years after *Lyons*, police officers attached a GPS tracker to the underside of the defendant's vehicle to monitor his movements. *Jones*, 565 U.S. at 401. The Supreme Court held this amounted to a common-law trespass onto the defendant's property such that a warrantless (and unreasonable) search had occurred. *Id.* at 405 ("It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted."). The Court explained that its cases from the latter half of the 20th century had strayed from a property-based trespassory approach to the Fourth Amendment, instead focusing on whether a defendant had a reasonable expectation of privacy in the area searched by Government officials. *Jones*, 565 U.S. at 405-07. However, the Court noted that the question of whether a defendant had a reasonable expectation of privacy in a particular place did not supplant a person's right to be free from physical intrusions upon constitutionally protected areas. *Id.*

In *Jardines*, police officers deployed a drug-sniffing dog on a homeowner's porch without a warrant. *Jardines*, 569 U.S. at 4. The Court held this amounted to an unreasonable search, as the officers trespassed onto the curtilage of the home by exceeding the scope of their license to the porch. *Id.* at 9-10. The Court wrote:

> The [Fourth] Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred.
>
> By reason of our decision in *Katz*,[6] property rights are not the sole measure of Fourth Amendment violations, but though *Katz* may add to the baseline, it does not subtract anything from the Amendment's protections

---

[6] *Katz v. United States*, 389 U.S. 347 (1967).

when the Government does engage in a physical intrusion of a constitutionally protected area.

That principle renders this case a straightforward one. The officers were gathering information in an area belonging to Jardines and immediately surrounding his house—in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

*Jardines*, 569 U.S. at 5 (internal citations and quotation marks omitted).

Buescher argues that *Lyons* is no longer valid authority in the face of *Jones* and *Jardines* and, that under those cases, Kerr conducted a warrantless search because K-9 Gus trespassed into a place law enforcement was not lawfully allowed to be without a warrant (inside the open window) while intending to obtain information about Buescher. The Government argues Judge Mahoney correctly relied on *Lyons*.

Judge Mahoney noted that some courts have held that a search occurs when a drug dog enters a vehicle before it alerts[7] while others have reached the opposite

---

[7] *See State v. Dorff*, 526 P.3d 988, 998-99 (Idaho 2023), *petition for cert. filed* June 21, 2023 (holding that drug dog jumping onto car's door for mere seconds constituted an unlawful trespass because the dog "intermeddled with" (by touching) the vehicle "*for the purpose of* obtaining information about, or related to, *the vehicle*"); *State v. Randall*, 496 P.3d 844, 853-56 (Idaho 2021) (relying on "the two-prong trespassory test" in *Jones* ("(1) a trespass by the government [that] is (2) for the purpose of obtaining information") to conclude that a lawful drug sniff became an unlawful trespass when the drug dog entered the vehicle; rejecting "instinctive entry rule" because it could not be determined that the drug dog jumped into vehicle because it detected the odor of drugs versus for some other reason, such as its eager disposition or that it was trained to jump into a vehicle whenever possible; and concluding that the record must therefore demonstrate that the officer had probable cause to believe drugs were inside the vehicle before the drug dog entered the vehicle); *Herrera-Amaya v. Arizona*, No. CV-14-02278-TUC-RM, 2016 WL 7664134, *9-10 (D. Ariz. Sept. 29, 2016) (disagreeing with the idea that the officer has to "actively encourage" a drug dog to enter the vehicle for it to be a search, and finding that the court cannot presume a drug dog jumped into a car because of odor of narcotics rather than providing its trained alert if it smelled drugs).

conclusion.[8] Ultimately, Judge Mahoney found the latter cases more persuasive. She compared this case to *United States v. Zabokrtsky*, No. 5:19-cr-40089-HLT-1, 2020 WL 1082583 (D. Kan. Mar. 6, 2020). The *Zabokrtsky* court wrote:

> Subsequent to Defendant's arrest, TPD Officer Patrick Lauver arrived at the scene with his canine partner, Colt, to conduct a sniff of the Tahoe. Officer Lauver first walked around the Tahoe to make sure there were not any hazards in or around the vehicle that would interfere with the sniff. During this check, Officer Lauver closed the open front passenger-side door. Officer Lauver and Colt then started the sniff at the rear bumper of the vehicle—with Officer Lauver commanding Colt to "find"—and worked around the Tahoe in a clockwise direction. During this initial pass, Officer Lauver noted that Colt came off the ground and sniffed an open window on the passenger side of the Tahoe. Once they had completed a full circle of the Tahoe, Officer Lauver guided Colt around the vehicle a second time—this time, in a counterclockwise direction. To begin the second rotation, Officer Lauver lightly touched the vehicle's right taillight with the back of his hand and again instructed Colt to "find." Officer Lauver testified that he touched the vehicle to keep Colt on task and also because he wanted Colt to restart his sniff from that point.

---

[8] *See United States v. Zabokrtsky*, No. 5:19-cr-40089-HLT-1, 2020 WL 1082583, at *6 (D. Kan. Mar. 6, 2020) (concluding drug dog jumping up on vehicle and putting its head inside vehicle did not constitute a search); *State v. Beames*, 511 P.3d 1226, 1233 (Utah Ct. App. May 12, 2022) (holding that "drug dog entering a vehicle without probable cause . . . is not a per se violation of the Fourth Amendment," and that such a search "can be permissible under the Fourth Amendment if '(1) the dog's leap into the car was instinctual rather than orchestrated and (2) the officers did not ask the driver to open the point of entry, such as a hatchback or window, used by the dog.'") (quoting *State v. Ruiz*, 497 P.3d 832, 837 (Utah Ct. App. 2021); *Ruiz*, 497 P.3d at 839 (upholding denial of motion to suppress based on discussion of Tenth Circuit precedent that no search occurs when canine enters vehicle on its own without assistance from officers (quoting *United States v. Vazquez*, 555 F.3d 923, 930 (10th Cir. 2009)), and based on the reasoning in *Randall*, concluding that the record showed the drug dog was trained to follow the odor of drugs and that this training (as opposed to training to jump into vehicles) is what prompted the drug dog to jump through the vehicle window; *see also Dorff*, 526 P.3d at 1001 (dissent) (relying on other cases decided after *Jones* and concluding that "[drug dog]'s contact with the vehicle's exterior here was likewise a minimal and incidental contact to generally sniff the exterior area around the vehicle," and finding inquiry should turn on the reasonableness of the governmental intrusion).

During the second rotation, while gesturing in an attempt to get Colt's attention and to focus him during the sniff, Officer Lauver also touched the front driver-side door seam. And, while at the front driver-side door, Colt stood on his hind legs, rested his front paws on the Tahoe, and began whipping his head back and forth and sniffing at the open window. Colt then sat down. Based on his training and experience with Colt, Officer Lauver understood this to be an indication that Colt had detected the odor of marijuana, cocaine, methamphetamine, or heroin. Officer Lauver informed the other officers at the scene that Colt had alerted and that the vehicle could be searched. Officers therefore searched the Tahoe. During that search, Officer Qualls found a firearm, which was ultimately discovered to have been reported stolen.

. . .

Here, Officer Lauver's contact with Defendant's vehicle was incidental and, in one instance, unintentional. He did not touch the Tahoe in an attempt to find something or obtain information. Rather, he was simply attempting to keep his canine partner focused and on task during the course of the sniff. This mere touching—without any manipulation or effort to discover what was within—does not constitute an illegal search.

And, as to any argument by Defendant that the Fourth Amendment was implicated when Colt jumped up and placed his front paws against the body of the Tahoe, courts have held that a dog's "minimal and incidental contact" with the exterior of a car is not a search. *See United States v. Olivera-Mendez*, 484 F.3d 505, 511-12 (8th Cir. 2007) (where drug-sniffing dog jumped and placed his front paws on the body of the defendant's car during a walk-around sniff, holding that "[t]he sniff … was comparable to other canine alerts evaluated by the Supreme Court, and it did 'not rise to the level of a constitutionally cognizable infringement' "). Likewise, to the extent Colt's snout broke the plane of the open driver-side window during the course of the sniff, the Tenth Circuit has held under similar circumstances that such "instinctive actions" do not violate the Fourth Amendment . . . .

For all of these reasons, the Court denies Defendant's motion to suppress the evidence seized during the July 9, 2019 traffic stop.

*Zabokrtsky*, at *2, *6 (footnotes omitted). *Zabokrtsky* thus adopted the approach of those courts that have focused on whether a drug-sniffing dog entered a vehicle "instinctively" (meaning because it smelled narcotics), not because its handler directed it to do so. *See, e.g., Lyons*, 486 F.3d at 373; *United States v. Sharp*, 689 F.3d 616,

10

619-20 (6th Cir. 2012) ("We now join our sister circuits in holding that a trained canine's sniff inside of a car after instinctively jumping into the car is not a search that violates the Fourth Amendment as long as the police did not encourage or facilitate the dog's jump."); *United States v. Mostowicz*, 471 Fed. Appx. 887 (11th Cir. 2012) (unpublished) ("Because [the K-9] jumped instinctively into the car without encouragement or facilitation from the officers, we see no Fourth Amendment violation."). Similarly, Judge Mahoney found that K-9 Gus attempted to get inside the vehicle because he smelled narcotics and, therefore, he was acting instinctively. She based this finding on the fact that K-9 Gus showed interest at the same window during the first pass. Doc. 43 at 9.[9]

While the initial issue is the current status of *Lyons*, neither party has addressed *United States v. Pulido-Ayala*, 892 F.3d 315 (8th Cir. 2018). In that case, the Eighth Circuit stated:

> The use of a well-trained narcotics dog around the exterior of a vehicle that has been lawfully stopped "does not expose noncontraband items that otherwise would remain hidden from public view," *United States v. Place*, 462 U.S. 696, 707 (1983), and "generally does not implicate legitimate privacy interests." *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). "Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." *Id.* at 408 (quoting *United States v. Jacobsen*, 466 U.S. 109, 123 (1984)). Consequently, "[t]he use of the drug-sniffing dog on the exterior of a vehicle during a valid traffic stop" is not a search and "does not infringe upon any Fourth Amendment rights." *United States v. Williams*, 429 F.3d 767, 772 (8th Cir. 2005).
>
> The inside of a car, however, is typically a different story. Police ordinarily cannot search the interior of an automobile unless they have

---

[9] Further, Judge Mahoney found Kerr had not directed K-9 Gus into the vehicle and that any of his contacts with or inside the vehicle itself were unintentional. *Id.* I agree with Judge Mahoney on the latter. Upon review of the video, I find that Kerr did not intentionally touch the vehicle or direct K-9 Gus to enter the vehicle, though his hand does appear to cross the plane of the open window.

probable cause to believe that the vehicle contains contraband or other evidence of a crime. *California v. Carney*, 471 U.S. 386, 392 (1985); *United States v. Ross*, 456 U.S. 798, 823 (1982). A drug dog is an instrumentality of the police, and the actions of "an instrument or agent" of the government normally are governed by the Fourth Amendment. *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614 (1989). It is foreseeable that trained canines will react instinctively to the scent of drugs, and Pulido–Ayala argues with some force that when police bring a dog to a scene with an open car door, and the dog enters a citizen's vehicle, the police have conducted a "search" within the meaning of the Fourth Amendment. *See United States v. Winningham*, 140 F.3d 1328, 1331 (10th Cir. 1998).

The government, citing prior decisions, suggests that if there is no "police misconduct," then the "instinctive action" of a trained police canine to enter a car does not violate the Fourth Amendment. In *United States v. Michael Lyons*, 957 F.2d 615 (8th Cir. 1992), this court did say that "[w]ithout misconduct by the police," a dog's "instinctive actions" in tearing open a package in an airline freight room did not constitute a "search." *Id.* at 617. In that case, however, the court continued by reasoning that the dog's alert alone, without the unintended opening of the package, would have given investigators probable cause to search the package, so the inevitable discovery doctrine justified admitting evidence of the package's contents. *Id.* Likewise, although *United States v. Kelvin Lyons*, 486 F.3d 367 (8th Cir. 2007), cited *Michael Lyons* for the proposition that "instinctive actions of a trained canine do not violate the Fourth Amendment," that decision too concluded that the challenged search inevitably would have occurred based on independent probable cause, even if the drug dog had not instinctively entered the defendant's vehicle. *Id.* at 373–74.

The district court thought the *Lyons* cases meant that "the officers' intent is dispositive," so that there was no search if Jampy acted instinctively and Sergeant McGinnis did not direct him to enter the car. But since the *Lyons* cases, the Supreme Court has emphasized that with two "limited exception[s]" for special-needs and administrative searches, the subjective intent of police officers is almost always irrelevant to whether an action violates the Fourth Amendment. *Ashcroft v. al-Kidd*, 563 U.S. 731, 736–37 (2011) (internal quotation marks omitted). There is reason to doubt, therefore, whether the district court's reading of the *Lyons* cases endures.

We need not explore the problem further in this case, because it is uncontroversial that if police had probable cause to search the car before

12

the dog entered the interior, then any search effected by the entry was permissible. No warrant is required to search a car with probable cause. *Carroll v. United States*, 267 U.S. 132, 149 (1925). Here, the district court found that when Sergeant McGinnis commanded the canine to find drugs, the dog "immediately" pulled McGinnis toward the open passenger door. Given the strong reaction of the trained drug dog while it was outside the car, together with Pulido–Ayala's suspicious reaction to the drug checkpoint, we conclude that police had probable cause to believe that the vehicle contained contraband in the moment before Jampy actually crossed the threshold into the interior of the Mini Cooper. The dog's reaction outside Pulido–Ayala's car distinguishes this case from *Winningham*, where the court affirmed the suppression of evidence when a police dog moved around the exterior of a car, entered through an open door, and "methodically sniffed" the vehicle's interior before alerting at a rear vent. 140 F.3d at 1330.

892 F.3d at 318-19.

Thus, the Eighth Circuit has expressed doubt about whether a canine acting "instinctively" remains relevant to the Fourth Amendment analysis. Based on *Pulido-Ayala*, *Jones* and *Jardines*, it is not apparent that a canine's instinctive actions will never violate the Fourth Amendment. As the Eighth Circuit noted in *Pulido*, "[a] drug dog is an instrumentality of the police, and the actions of 'an instrument or agent' of the government normally are governed by the Fourth Amendment. *Pulido-Ayala*, 892 F.3d at 318 (8th Cir. 2018) (quoting *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614 (1989)). If a police officer's intent is normally irrelevant to a constitutional inquiry, *see, e.g., Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011), it is not clear why a canine's indiscernible motives would define the contours of an individual's right to be free from Government intrusion.

Nor is it clear when K-9 Gus entered the vehicle to better his position to detect narcotics and when he did so as an alert. Kerr agreed that the only "tell" K-9 Gus exhibited before signaling in his final position was that he attempted to get into the vehicle. He did not specify at what point K-9 Gus transitioned from "sniffing

around"[10] to "trying to get into the vehicle." Kerr testified as follows concerning the third pass:

Q.  And then in the third pass, did you notice anything?

A.  Yes.

Q.  And what was that?

A.  While on the driver's side window, Gus tried to get into the vehicle by jumping in.

Q.  And is that something that -- what is he trained to do as far as odor of narcotics?  What is he trained to do physically?

A.  He has alert behaviors that I am watching for as handler to show that he has found that odor, and then once he recognizes the odor, he goes to a trained final response which is a sit.

Q.  But before any final -- and did he do a final response in this case?

A.  Yes.

Q.  And in other words, did he sit by that front driver's side door and window?

A.  Yes.

Q.  And then what's his reward?

A.  A little tug, slash, ball with a tug on it.

Q.  And then at the conclusion of his deployment, is he put back in the vehicle?

A.  Yes.

Q.  Is that also shown on the video?

A.  Yes.

   …

Q.  And what are some of the clues that you look for in his physical behaviors to see that he's showing interest that may come towards an alert?

A.  Say that again.

---

[10] Interest alone (as opposed to an alert) cannot support probable cause.  *United States v. Jacobs*, 986 F.2d 1231, 1234-35 (8th Cir. 1993).

14

Q. What are some of the behaviors he uses that you focus on to see whether he is showing interest or alerting?

A. For alerts it would be a head snap, a change in breathing. When he's breathing extra hard, if he's in the odor, he'll close his mouth and also take deep sniffs.

Q. And that's different than his ordinary actions with sniffing and moving?

A. Yes.

Q. Did you see some of those changes in behavior at some point in the deployment in this case?

A. He did not have any of those alerts, just trying to jump in the window.

Doc. 44 at 18-20.

Q. And what's the difference you saw in his interest on the first pass at that driver's door window and then his more alert behavior on the third pass? What was the difference?

A. On the first pass he just put his nose in there on his own and just sniffed for a few seconds and then continued on where on the third one he put his nose in there and then was trying to actively get in that vehicle.

...

Q. And then on the third pass before he sat, he showed what type of alert-like behaviors?

A. The behavior of just trying to get into that vehicle.

Q. Multiple times; is that fair?

A. Yes.

*Id.* at 24.

A. I would say on the first pass when he jumped up in the window, that would be interest that he -- in my head I'm seeing him sniffing something longer than he normally would. An alert would be his response that is when he detects odor.

*Id.* at 28.

The Government makes no meaningful attempt to discern at what point the officers had probable cause to search the vehicle. *See* Doc. 49 ("Officer Kerr testified

15

generally to K-9 Gus following his training and officer Kerr's directions as K-9 Gus was deployed around defendant's vehicle three times, including the showing of some interest at the driver's door (with window partially open) on the first pass and a stronger indication and ultimately a positive alert on the third pass at the same area."). Kerr testified K-9 Gus is trained to attempt to enter vehicles and has entered vehicles in the past while attempting to find narcotics:

> Q.  But what are some behaviors that he shows that gives you an idea that he is alerting?
>
> A.  By trying to jump into that window.
>
> Q.  And have you seen that in the past?
>
> A.  Yes.
>
> Q.  Has he jumped in open car doors to find drugs?
>
> A.  Yes.
>
> ...
>
> Q.   And when he did so, what did he do after he got higher on that vehicle on the third pass?
>
> A.  He put his nose in the vehicle and then tried to jump into the vehicle.
>
> Q.  Is that what he's trained to do?
>
> A.  Yes.

Doc. 44 at 19, 22-23.

I find, as *Pulido-Ayala* suggests, that *Lyons* is not determinative.[11]  While some courts have found no Fourth Amendment violation when a drug-sniffing dog breaks the plane of an open window, those decisions were largely prior to *Jones* and *Jardines*. *See United States v. Pierce*, 622 F.3d 209, 214-15 (3d Cir. 2010) ("And we apply the considerable body of jurisprudence examined above to conclude that [the K-9 officer's]

---

[11] It is also worth noting that in both *Lyons* and *Pulido-Ayala*, the Eighth Circuit noted that the police officers had probable cause to search the vehicle before the drug-sniffing dog entered the vehicle.  Here, the Government does not argue that law enforcement had probable cause to search the vehicle prior to K-9 Gus' alert on the vehicle.

interior sniffs, as a natural migration from his initial exterior sniffs, did not constitute a search requiring a warrant or probable cause."); *United States v. Mason*, 628 F.3d 123, 130 (4th Cir. 2010) (finding no Fourth Amendment violation where the drug-sniffing dog alerted on the vehicle before entering through its window and the handler had not prompted the dog to do so); *Sharp*, 689 F.3d 616, 619-20 (6th Cir. 2012) (see above); *United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989) ("We agree with the district judge that the dog's instinctive actions did not violate the Fourth Amendment. There is no evidence, nor does Stone contend, that the police asked Stone to open the hatchback so the dog could jump in."); *United States v. Mostowicz*, 471 Fed. Appx. 887 (11th Cir. 2012) (unpublished opinion) (see above); *but see United States v. Guidry*, 817 F.3d 997, 1006 (7th Cir. 2016) (finding the sniff search to be lawful because at the time the dog's head entered the vehicle, officers had probable cause to search it).

As for *Zabokrtsky,* I find it unpersuasive. A majority of the court's reasoning refers to incidental touching by the officers to the external part of the vehicle. Buescher does not meaningfully argue that either K-9 Gus or Kerr violated his rights by touching the outside of his vehicle. And when *Zabokrtsky* does reference the dog's snout breaking the plane of the open window, it relies on a pre-*Jones*, pre-*Jardines,* Tenth Circuit case (*United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989)), which emphasizes the instinctual actions of police canines.

Returning to *Jones* and *Jardines*, "[w]hen the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred. *Jardines*, 569 U.S. at 5. "It is beyond dispute that a vehicle is an 'effect' as that term is used in the Amendment." *Jones*, 565 U.S. at 404. Intrusion may include a mere touching (such as the tracking device in *Jones*) or by exceeding a license to a place (such as the bringing a drug-sniffing dog to the curtilage of a home in *Jardines*). However, it must be accompanied by the intent to gather information.

17

Here, there is no doubt that a physical intrusion occurred. Indeed, before his final alert, K-9 Gus was actually dangling out of Buescher's window:





Kerr himself would not have been constitutionally permitted to enter the vehicle without a warrant. *See California v. Carney*, 471 U.S. 386, 392 (1985). Similarly, K-9 Gus' entry into the open window was a trespass with an intent to obtain information. While canine sniffs enjoy *suis generis* status (*Caballes*, 543 U.S. at 409), they are not exempted from a trespass analysis under *Jardines*. As the *Jones* Court stated: "It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information." *Jones*, 565 U.S. at 404. The same conduct occurred here. As such, I find the Government conducted a warrantless and unreasonable search of Buescher's vehicle by allowing K-9 Gus to insert his head into the open window of that vehicle.[12]

As for the appropriate remedy, "[e]vidence obtained in violation of the Fourth Amendment is subject to the exclusionary rule and, therefore, 'cannot be used in a

---

[12] "One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy." *Jardines*, 569 U.S. at 10.

criminal proceeding against the victim of the illegal search and seizure.'" *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). The exclusionary rule applies to both the direct evidence gathered from a Fourth Amendment violation, as well as indirect evidence otherwise derived from the illegality. *United States v. Miller*, 11 F.4th 944, 954 (8th Cir. 2021). However, "[a]s a judicially-created remedy, the exclusionary rule applies only where 'its remedial objectives are thought most efficaciously served,'" and its remedial objective is deterrence. *United States v. Hamilton*, 591 F.3d 1017, 1028 (8th Cir. 2010) (*quoting Arizona v. Evans*, 514 U.S. 1, 10 (1995)); *United States v. Scroggins*, 361 F.3d 1075, 1083 (8th Cir. 2004) ("The exclusionary rule's purpose is deterrence.").

The Government argues that Judge Mahoney correctly found no police misconduct, as Officer Kerr did not act unreasonably or improperly, but in lawful accordance with his (and K-9 Gus') training. Doc. 49 at 4. Therefore, the Government concludes, no legitimate interests would be advanced by excluding the evidence. However, K-9 Gus—as an instrumentality of the Government—intruded on a constitutionally protected space. Not only had K-9 Gus done this previously, but Officer Kerr suggested K-9 Gus is actually trained to do so. As such, applying the exclusionary rule will afford meaningful deterrence in the form of updated training and practices concerning the need to avoid physical intrusions into the interior of a vehicle during a canine sniff.

## V.    CONCLUSION

1.    For the reasons set forth herein, I **decline to adopt** the Report and Recommendation (Doc. 43).

2.    The defendant's objections (Doc. 46) to the Report and Recommendation are **sustained**.

3.     The defendant's motion to suppress (Doc. 31) is **granted**.  All physical evidence obtained as a result of the search of defendant's vehicle on January 23, 2023, are hereby **suppressed**.

**IT IS SO ORDERED.**

**DATED** this 12th day of September, 2023.

_____
Leonard T. Strand, Chief Judge